UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 11, 2016

UNITED STATES OF AMERICA

- v. -

SHANE GILLEO,

                      Defendant.

------------------------------------------------------------------X

15 Cr. 346 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, United States District Judge:

      On June 9, 2015, a two-count Indictment was returned against defendant Shane Gilleo.  Count One charged Hobbs Act robbery, 18 U.S.C. § 1951, and Count Two charged firearm carrying and possession and brandishing in furtherance of a crime, 18 U.S.C. § 924 (c).  Defendant pled guilty to the Hobbs Act charge on December 1, 2015.

      In connection with defendant's scheduled sentencing, the parties requested a Fatico hearing on two issues:  1) whether the weapon defendant possessed a firearm or a BB gun during the incident, and 2) whether defendant "brandished" or "otherwise used" the weapon.

      The Court held the hearing on February 19, 2016.  At the hearing, the Government called the victim of the robbery.  The defense called the defendant, defendant's mother Crystal Gilleo, and Brian S. Blume, an individual

1

knowledgeable in firearms and BB guns.[1]  The parties submitted a total of five exhibits, and the Court also received one exhibit each directly from the victim, defendant, and Mr. Blume.[2]

For the reasons set forth below, this Court finds by a preponderance of the evidence that defendant possessed a firearm at the time of the incident.  The Court also determines that defendant brandished that firearm but that his use did not rise to the level of "otherwise used" as defined by the U.S. Sentencing Guidelines ("USSG").

I. FACTS

    A. The Robbery

The victim was a night shift taxi driver.  (Tr. 12:9-15.)[3]  At around midnight on April 23, 2015, she was waiting in her taxi at a common passenger pick-up location in Peekskill.  (Tr. 14:14-15:5.)  She saw an individual approaching whom she recognized as the defendant, as she had driven him in her taxi on multiple prior occasions, and she knew his father.  (Tr. 16:12-25; 17:11-18:5; 18:16-19:23.)  The defendant got in the taxi, sat down in the rear passenger-side seat, and asked the victim to drive him to an address within Peekskill.  (Tr. 20:1-14.)

When she arrived at the location, the victim put her hand over her right shoulder to motion for payment.  (Tr. 22:25-23:4.)  Instead of paying, the defendant

---

[1] The Court did not formally accept Mr. Blume as an "expert" in a defined area.  Rather, the Court determined that he had substantial experience in firearm acquisition and substantial familiarity with BB guns.  The Court therefore allowed him to testify as helpful to the trier of fact on the issue of identifying the type of weapon used.
[2] The Court had the victim and defendant each draw their recollection of the aperture of the weapon and had Blume draw the aperture of a .22 caliber weapon.
[3] "Tr." refers to pages of the February 19, 2016 Fatico hearing transcript.

stated, "I'm sorry, Miss, I have to do this." (Tr. 23:10-12.) The victim turned around and saw "a gun staring at [her] in the face" about an inch or two away. (Tr. 23:22-24:10.) The gun was small and silver, with a "black hole" at the end of the barrel. The victim reached back and pushed the gun towards the floor; the gun was small enough that she touched defendant's hand gripping it. She described feeling cold, sturdy metal, that there was a "brim" on the top of the gun, and identified it as a .22 caliber semiautomatic pistol, as it did not have the round compartment of a revolver. (Tr. 25:7-26:2; 26:9-27:11.)

The victim held the weapon for about three seconds before defendant pulled it back and pointed it at her again. (Tr. 27:20-28:1; 50:8-12.) He demanded payment, and the victim gave him approximately $130. Defendant then demanded victim's phone, and she gave him the cellphone provided by the taxi company. (Tr. 28:1-22.)

During this time, defendant continued to point the gun at the victim's face. (Tr. 28:22-29:4.) The victim again pushed the gun away, telling the defendant that the situation was not so serious that he should shoot. (Tr. 29:5-15.) Defendant demanded the victim's other phone, and she gave him her personal cellphone. (Tr. 29:17-24.) Defendant, who was still holding up the gun, asked for more money, and the victim told him she had no more. (Tr. 30:1-2.) She pleaded with him to not shoot. (Tr. 30:4-6.) Defendant demanded the keys to the taxi, and the victim relented. (Tr. 30:7-11.) Defendant then left the taxi and ran towards the rear of a building. (Tr. 30:12-16.) Defendant testified that he threw away the weapon and the keys behind the building. (Tr. 62:18-23; 68:14-23.)

The primary difference between the victim's account of the robbery and that given by defendant is with respect to the position of the weapon. Defendant testified that upon arrival at the destination, he pulled out the weapon but did not point it at the victim. Rather, he "pressed it into her stomach." (Tr. 62:10-13.) Defendant testified that the victim never grabbed the weapon but did "push" it back. (Tr. 65:8-14.) Defendant also testified that he told the victim, "Miss, I don't want to hurt you. I just want the money so I can leave." (Tr. 62:16-18.)

After the defendant left the vehicle, the victim called the police from a third, prepaid cellphone. (Tr. 31:2-32:3; GX 3.) The victim told the police that she had been robbed and that the assailant used a .22 caliber. (Tr. 41:12-23.) She testified that following the incident, her boyfriend had shown her a .22 caliber pistol for comparison and that the guns were the same size. (Tr. 43:3-44:16.) The victim also had some prior experience with handguns: in the weeks prior to the incident, she had handled firearms owned by her supervisors at the taxi company, and when she was a child her brother had jokingly pointed a firearm at her head. In addition, the victim regularly perused gun magazines at a rest stop popular with other taxi drivers. (Tr. 32:8-34:15.) Following the incident, she purchased a firearm.

The victim also had prior familiarity with BB handguns. Her brothers owned a number of them and they had been around her house when she was growing up. Her familiarity included BB guns made to mimic firearms. Her first-hand experience with BB guns continued until a year or two prior to the robbery at issue. (Tr. 34:16-35:7; 35:20-36:11.) The victim was able to describe in detail differences

4

between a BB gun and real gun. She described the solidity and quality of the metal used in a firearm as opposed to a BB gun, the sight ridge on a firearm as different from that on a BB gun, and that only BB guns have a latch to secure BBs and $CO_2$ cartridges. (Tr. 35:8-19; 36:8-17.) The victim testified that she had never seen a silver BB gun. (Tr. 36:18-25.)

B.  The Weapon in Question

By defendant's account, in April 2015, he was without a job and had no other options for income, so he decided to rob a taxi. (Tr. 56:5-21.) He testified that he used a BB gun he had acquired a number of years before, in 2007 or 2008.[4] The Court found several aspects of defendant's testimony lacking in credibility.

Defendant initially testified clearly that he was fifteen when he acquired the BB gun, but as he continued to testify and was cross-examined, the timing became decidedly less clear.[5] He had been incarcerated from age fifteen to nineteen, making his purchase of the BB gun at age fifteen unlikely (he also testified he lived with a girlfriend and not with his mother at age fifteen). (Tr. 74:12-75:3; 75:24-76:8.) Defendant subsequently testified that he acquired the gun when he was "thirteen or fourteen." (Tr. 54:1-8; 75:15-21.)

Defendant testified that he and his brother acquired the BB gun by asking a passerby at Walmart to purchase one for them because they were both under eighteen at the time. The brothers had already perused the selection in the store

---

[4] The Court notes that this time period is largely contemporaneous with when the victim's personal experience with BB guns ended.
[5] This could have been a reasonable lack of precision or more – when combined with other inconsistencies, the Court views it as more.

5

and knew that with the $30 to $40 they had, they "could only buy, I think it was three of them with the money that we had." (Tr. 54:10-24; 63:2-7; 75:15-23.) Defendant claims that the BB gun the straw buyer purchased for them looked real and could be mistaken for a firearm; he testified that it was silver in color except the black grip handle where the CO2 cartridges were held. (Tr. 55:3-7; 66:3-18.) Despite allegedly owning the BB gun for eight or so years, defendant did not recall the brand or model. (Tr. 69:24-25; 70:1-2.)

Defendant emphatically testified that his mother never knew about the BB gun. (Tr. 73:24-25.) She, however, testified that in 2015, she found a bag in defendant's drawer which, by touch, she identified as a gun. She and her son argued and he specifically told her that the bag contained a BB gun. (Tr. 88:18-90:9.) Furthermore, defendant's mother testified that she had known of the BB gun prior to the argument as she was familiar with an injury her son received from it. (Tr. 91:8-19.)[6]

Defendant also testified that he maintained the gun in a sneaker box in his closet. (Tr. 73:17-23.) The gun his mother found was in a bag in his drawer, not a shoebox in his closet. (Tr. 92:16-25.)[7]

Finally, defendant was asked whether he brought a weapon to a robbery to which he pled guilty in 2008; his answers were evasive and contradictory.

---

[6] Based on their demeanor and inconsistencies, the Court finds that defendant and his mother were both being untruthful when they testified as to whether she knew about the BB gun and whether the gun found in his drawer was in fact a firearm.

[7] The Court also notes unexplained discrepancies in when the BB gun was for the eight years defendant owned it. He seemed to suggest it was always in the shoebox in the closet at his mother's house, but then it was at his ex-girlfriend's house, but then somehow it made it back to his mother' house. (Tr. 73:17-23; 74:12-75:3; 75:24-76:8.)

6

Defendant at first insisted "I actually didn't commit the robbery. I pled guilty to a robbery." (Tr. 85:12-14.) He then stated, "I did" commit the robbery. (Tr. 85:22-23.) But in the next breath, he stated that "I couldn't understand. I couldn't read. So I didn't understand anything in the plea agreement that I signed at the time." (Tr. 85:25-86:2.) When asked whether he had "ever brought a weapon to a robbery before," defendant stated, "No, I have not. Yes, I have. Yeah, I have, sorry." (Tr. 85:10-11.) Moments later, when asked whether he brought a weapon to the 2008 robbery, defendant contradicted himself again, stating, "I didn't bring a weapon to any robbery." (Tr. 85:17-18.)[8]

    C.    <u>Weapons Expertise</u>

Brian Blume, a firearms dealer and technician for a defense contractor, testified at the hearing. (Tr. 94:21-25.) Mr. Blume has been a licensed firearms dealer with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives for about 25 years, and has handled, bought, and sold many forms of weapons including handguns and BB guns. (Tr. 95:7-19.) Mr. Blume has owned BB guns for fifty years and has studied them closely, and has had a handgun license for many years. (Tr. 95:25-96:23.) He has fired "every kind [of BB gun] there is." (Tr. 97:2-6.) While Mr. Blume testified that he was familiar with the range of BB guns available at Walmart between 2007 and 2008, (Tr. 97:25-98:6; 103:7-15), he conceded he had not purchased BB guns from any retailers in many years, including the 2007-08 timeframe. (Tr. 26-97.) The Court finds he lacked knowledge as to what BB guns

---

[8]    The Court acknowledges that this inconsistency could be explained in part by the fact that the weapon defendant used in connection with the prior robbery was a knife and not a firearm.

7

Walmart in fact was offering at the relevant point in time or the price point at which Walmart sold them.

The Court did find some of Mr. Blume's knowledge helpful.  For example, he explained that there are two types of BB guns: "plinking" guns not meant to mimic firearm models available on the market, and those that exactly mimic many of the characteristics of firearms including their appearance, size, weight, and balance.  (Tr. 99:3-23.)  However, even those "mimicking" BB guns had different interior mechanisms, metal quality, and a $CO_2$ cartridge cap in the handle grip.  (Tr. 100:20-101:1; 109:5-22; 106:8-107:5.)  Mimicking guns are much more expensive than plinking guns.  (Tr. 102:20-103:6.)  Although Mr. Blume has seen silver BB guns that mimic semiautomatic firearms, he conceded that silver BB guns were not as plentiful.  (Tr. 100:3-17.)

The defense submitted two exhibits that contained offerings of BB and pellet handguns from Walmart's website in 2016.  (Tr. 114:23-115:17; CX 4, 6.)  One catalog, submitted by Mr. Blume, shows only one BB gun that was silver—but the part that was silver was the handle, not the body.  (Tr. 115:18-21; CX 4.)  The other document, submitted by defense counsel after the Fatico hearing, contains only three silver semiautomatic BB or airsoft handguns out of over 150 samples.  None of the three could have been the one defendant alleges he used to rob the victim: two had orange caps on the barrel tips and obviously did not closely mimic a real gun, and another cost nearly $200.  (CX 6, at 14-16.)  The Court is aware that these listings reflect 2016 offerings; however, defendant has presented no evidence that in

2007 or 2008 Walmart sold BB guns matching the characteristics described by the defendant at the price point he paid. Notably, despite the rarity of silver mimicking BB guns, defendant himself stated that with the $30 or $40, he and his brother could only afford three of the various selections available at Walmart. There is insufficient evidence that given such limitations, the defendant was able to purchase a BB gun that mimicked the qualities (including in particular the weight) of an actual firearm, in silver, at Walmart.

II.     APPLICABLE LEGAL PRINCIPLES

Courts faced with disputed factual issues relevant to a sentencing proceeding have broad discretion in determining how to resolve such issues. United States v. Bahel, 662 F.3d 610, 646 (2d Cir. 2011). Courts can, but are not required to, hold evidentiary hearings at which witnesses testify and are subjected to cross-examination. See United States v. Fatico, 597 F.2d 707, 711-14 (2d Cir. 1978). A court must make its determinations of disputed issues using the "preponderance of the evidence" standard. United States v. Ahders, 622 F.3d 115, 119 (2d Cir. 2010); United States v. Garcia, 413 F.3d 201, 220 n. 15 (2d Cir. 2005). Because such factual disputes are in connection with a sentencing proceeding, the Federal Rules of Evidence do not apply. Fed. R. Evid. 1101; Fatico, 597 F.2d at 713-14. For example, courts are not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. Fatico, 597 F.2d at 713-14.

As used in the Sentencing Guidelines, a "dangerous weapon" means "an instrument capable of inflicting death or serious bodily injury; or . . . an object that

is not an instrument capable of inflicting death or serious bodily injury but . . . closely resembles such an instrument." USSG § 1B1.1, n.1 (D) (2015). A "firearm" a subcategory of dangerous weapon, and refers to "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Id. § 1B1.1 n.1 (G). "A 'BB' or pellet gun that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm." Id. § 1B1.1 n.1 (G).

"Brandished . . . means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present." Id. § 1B1.1 n.1 (C); see also United States v. Matthews, 20 F.3d 538, 554 (2d Cir. 1994) (holding that when a defendant points a weapon at the victim, he makes a "gesture that is inherently threatening").

"Otherwise used . . . means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." Id. § 1B1.1 n.1 (I). It is clear that "otherwise used" falls between "brandished" and "discharged" under the Sentencing Guidelines. See USSG §§ 2B3.1 (b)(2)(A-C); United States v. Speed, 2015 WL 6644346, *3 (2d Cir. 2015). Because "brandished" means displaying or otherwise making the weapon known in order to intimidate the victim, "otherwise used" needs to do more. Speed, 2016 WL 6644346, at 3.

10

Accordingly, under the Sentencing Guidelines for robbery,

(B) if a firearm was otherwise used, increase by **6** levels;
(C) if a firearm was brandished or possessed, increase by **5** levels;
(D) if a dangerous weapon was otherwise used, increase by **4** levels;
(E) if a dangerous weapon was brandished or possessed, increase by **3** levels;

USSG § 2B3.1.  Therefore, the factual determinations made by this Court as to whether a real firearm or a BB gun was used during the robbery, and whether defendant merely brandished it or otherwise used it, greatly impacts the defendant's guidelines sentence—specifically, whether the defendant gets a three-level or a six-level enhancement.

III.   DISCUSSION

The determination of the disputed factual issues hinges on the credibility of the defendant and victim, both of whom were examined and cross-examined at trial. The Court found a number of inconsistencies and missing details in defendant's testimony which substantially weaken his credibility.  On the other hand, the Court credits the victim's testimony, which was detailed, substantive, and consistent with her prior statements.

   A.   Firearm or BB Gun

The Court finds by a preponderance of the evidence that the weapon defendant used to commit the robbery was a firearm.  This determination is based on the Court's conviction that while the defendant may have purchased and owned a BB gun at some earlier point in his life, that was not the gun used during this robbery.  The Court's determination is based on a number of points, including the

gun's characteristics, inconsistencies in defendant's own testimony, and the witness's credible testimony as to the weapon she observed.

First, there is no record evidence that defendant could have purchased a BB gun from Walmart in 2007-2008 for $30 to $40 that had the characteristics of the gun used in the robbery. The victim credibly testified that the gun used in the robbery had a silver body / barrel, was made of metal, appeared to be a semiautomatic-style pistol, and was likely .22 caliber or similar in size. Defendant does not contest that these were the characteristics of the weapon he used. Of the dozens of BB gun samples contained in the Walmart online catalog provided by the defense, few were silver and none match the characteristics of the gun based on the objective evidence. (See CX 4; 6). As stated above, there is insufficient evidence that a silver BB gun designed to mimic a real gun (in terms of quality and solidity of metal) was sold by Walmart in 2007-08 at the low price point ($30 to $40) defendant testified he paid. Rather, a silver gun, solidly built with heavy gauge metal that would match the victim's description, would likely have cost far more than what defendant paid for his BB gun.

Furthermore, the Court did not find defendant's testimony credible in certain respects. Defendant's version of the story contained several major inconsistencies, such as how old he was when he bought the BB gun, whether his mother knew about it, and where he kept it. Defendant was also unable to provide details that one would expect him to know, especially since he claims he owned the BB gun for eight years and frequently used it in the backyard with his brother, such as what

12

brand or model the BB gun was or how the gun traveled from his mother's house to the ex-girlfriend's house and back to his mother's house again.  Finally, defendant testified that he threw away the BB gun immediately after he completed the robbery, which of course makes little sense if indeed it was merely a BB gun, and much more sense if it were a firearm.  Defendant was also not forthcoming in his testimony when asked about his 2008 conviction for first degree robbery.

Finally, the victim's testimony at the Fatico hearing was internally consistent on direct and cross-examination, and consistent with her prior statements to law enforcement reflected in the § 3500 materials.  The victim is more knowledgeable than the average person about BB guns and firearms:  she had been around and had handled both in the past, and frequently read gun magazines in the interest of buying a firearm of her own.  Her contact with BB guns lasted until about 10 years ago, which is approximately when defendant claims he purchased a BB gun.  The victim acknowledged she is not a weapons expert, but the Court finds that she has also provided convincing evidence that she observed an actual firearm.

B.   Brandished or Otherwise Used[9]

As argued by the parties here, the question of whether the firearm was "brandished" or "otherwise used" is essentially a legal one.  The facts are largely agreed:  defendant showed the firearm to the victim as he held up her taxi and demanded money from her.  Both versions agree that the defendant essentially

---

[9] The parties do not dispute that defendant at least "brandished" the weapon: he displayed the entire weapon, the victim saw it, and the weapon was displayed in order to intimidate the victim. See USSG § 1B1.1 n.1(C).

engaged in what might be colloquially referred to as "stick up". The victim claimed that the defendant held the firearm a couple of inches from her face and demanded money; in contrast, defendant testified that he did not hold it up against her face but rather pressed it against her belly and asked for money but apologized while doing so. The Court does not view the difference between the two versions to be material in this instance but leaves open the possibility that the distinction could be material in cases where the surrounding facts and circumstances are different. To the extent that a factual finding is necessary here, the Court finds by a preponderance of the evidence that the firearm was pointed in the victim's face several times and that the defendant repeatedly demanded she provide money and property (her cellphones and car key).

On March 4, 2016, when the Court heard oral argument on this motion, it sought to have the Government clearly explain the boundary that it viewed between acts which constituted "brandishing" from those constituting "otherwise used." The Government could not do so persuasively. From the oral argument, it appears that the Government's view is that "brandishing" is limited to a defendant making the presence of a gun known to a victim, perhaps even visually, but neither pointing it nor accompanying such display with words. In other words, according to the Government's definition, a rather routine "stick-up" such as that here (that is, pointing a gun and demanding money), constitutes "otherwise used" and not

"brandishing."[10] This is far too broad and one unsupported by the Guidelines and caselaw.

The stick-up here fits more comfortably within the definition of "brandishing" and is supported by both the evolution of the Guidelines and case law. Up until 2000, the Guidelines defined brandishing as including "pointed" or "waved." See USSG § 1B1.1, n.1 (C) (1998).[11] In 2000, the "pointed" / "waved" requirement was eliminated and replaced instead with the phrase "displayed" or "otherwise made known." This change appears to effect a broadening of the definition of "brandishing," not a narrowing. (It is certainly clear that prior to 2000, if a gun was pointed, e.g., as in a "stick-up," it would have been "brandished.") There appears to be no reason why that does not remain the case today. Moreover, case law in this area suggests that the situations for "otherwise used" are in some manner more extreme than a routine "stick-up." See Speed, 2015 WL 6644346, at *3 (holding that defendant "'otherwise used' a firearm when he pressed it into his victim's neck [for several hours] and threatened to kill him").[12] In contrast, a prototypical example of "otherwise used" is pistol-whipping. Smith v. United

---

[10] To draw out the Government's position in this regard, the Court gave a number of hypotheticals. The Government appeared to suggest that having the gun merely displayed but not pointed would constitute "brandishing." (Mar. 4, 2016, Tr. 21:13-15.) However, it stated that pointing the gun at a victim silently would constitute "otherwise used" and not "brandishing." (Id., Tr. 23:10-12.) Likewise, the Government stated that pointing, accompanied by words, would constitute "otherwise used." (Id. Tr. 24:13-19.)

[11] "'Brandished' with reference to a dangerous weapon (including a firearm) means that the weapon was pointed or waved about, or displayed in a threatening manner." USSG § 1B1.1, n.1 (C) (1998).

[12] Here, the entire robbery took at most minutes. Defendant testified the robbery took about a minute. (Tr. 65:24-66:2). The 3500 materials state the incident occurred at 12:20 a.m., and the report time was 12:30 a.m.

States, 508 U.S. 223, 233 (1993) ("No court of appeals ever has held that using a gun to pistol-whip a victim is anything but the 'use' of a firearm.").

The Court is further persuaded that the defendant here did not "otherwise use" the firearm because his statements to the victim attempted to ameliorate the threat, not amplify it. Other than demanding specific objects—money, phones, and keys, the only other statements the defendant made were apologetic: "I'm sorry, Miss, I have to do this" and "I don't want to hurt you."[13]

IV.  CONCLUSION

For the reasons set forth above, the Court finds by a preponderance of the evidence that defendant brandished a firearm to rob the victim.

Dated:     New York, New York
           March 11, 2016

_____
KATHERINE B. FORREST
United States District Judge

---

[13] Both parties agreed that defendant uttered some version of an apology.